# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DEVELOPMENT SPECIALISTS, INC., as assignee for the benefit of creditors of InLight Interactive, Inc., | ) ) ) ) | |
| Appellant, | ) ) | Case No. 05 C 6238 |
| v. | ) ) ) | |
| COMDISCO, INC., et al., | ) ) | |
| Appellees. | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On July 20, 2005, Bankruptcy Judge Bruce W. Black granted Comdisco, Inc.'s motion for summary judgment on Development Specialists, Inc.'s (DSI's) breach of contract proof of claim against Comdisco and on Comdisco's breach of contract counterclaim against DSI. DSI appeals from that order. For the reasons stated below, the Court affirms the bankruptcy judge's ruling.

### Facts

Before filing for bankruptcy on July 16, 2001, Comdisco was in the business of providing information technology, telecommunications, electronics, and laboratory equipment and services. Before discontinuing its business in late 2000, InLight Interactive, Inc. was in the business of designing, developing, manufacturing, and marketing interactive video and computer-based systems which provided health and medical information to patients. On December 20, 2000, InLight transferred its remaining assets and property to DSI as "Trustee-Assignee." In that capacity, DSI is responsible for liquidating and distributing InLight's assets and property and

collecting any money owed to InLight.

On March 13, 2000, Comdisco and InLight entered into a "Sponsorship Agreement." Under the terms of the contract, Comdisco, as sponsor, agreed to pay InLight for the rights to brand and advertise on InLight's video and computer systems, and InLight agreed to promote Comdisco's products and services to customers and contacts in the health care community. Specifically, Comdisco agreed to pay InLight $1.875 million each calendar quarter with the understanding that InLight would "invoice [Comdisco] for its quarterly installment . . . by the fifteenth day of the month preceding the beginning of each calendar quarter." Def. Amend. L.R. 56.1 Stmt. ¶9. The contract further provided that Comdisco's payment obligations would be delayed in the event InLight failed to invoice Comdisco in a timely fashion.

Regarding termination and limitation of liability, the contract stated as follows:

> **3.2.** **Termination** . . . [E]ither party may terminate this Agreement if the other party materially breaches a material obligation hereunder, and if in the opinion of the non-breaching party such breach remains uncured . . . .
>
> . . .
>
> **3.5.** **Termination by Insolvency.** Either party may immediately terminate this Agreement by providing written notice to the other party if the other party ceases to function as a going concern, becomes insolvent, makes an assignment for the benefit of creditors, files a petition in bankruptcy, permits a petition in bankruptcy to be filed against it, or admits in writing its inability to pay its debts as they mature, or if a receiver is appointed for a substantial part of its assets.
>
> . . .
>
> **8.2** **LIMITATION OF LIABILITY GENERALLY. EXCEPT AS SET FORTH IN SECTION 8.1, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL[,] OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT OR ITS TERMINATION, WHETHER LIABILITY IS ASSERTED IN CONTRACT, TORT (INCLUDING NEGLIGENCE)[,]**

**STRICT LIABILITY[,] OR OTHERWISE AND IRRESPECTIVE OF WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE.**

*Id.*

On March 20, 2000, DSI invoiced Comdisco for the first and second quarter 2000 sponsorship fees, and Comdisco made payments. In June 2000, Comdisco became aware that InLight was financially strapped for cash. Comdisco then informed InLight that Comdisco wanted to terminate the Sponsorship Agreement and, according to InLight, said it was not going to make the third quarterly payment or any other quarterly payments under the Sponsorship Agreement. Comdisco's officers also expressed concern that if it continued to make quarterly payments, it would get no benefit from its investment.

Also in June 2000, prior to any other payment becoming due under the agreement, InLight advised Comdisco that its investment in InLight would likely become "diluted." *Id.* ¶16. At the same time, InLight presented Comdisco with a proposal to restructure the Sponsorship Agreement. *Id.* ¶17. The proposal stated:

> By this proposal InLight seeks $18.75M in bridge financing, an amount equivalent to the ten remaining $1.875M professional sponsorship fee payments . . . . Since the sponsorship arrangement is terminable at any time, Comdisco is still exposed to InLight's execution risk and therefore should receive a private equity return that we have assumed to be 50%.

*Id.* The proposal further stated that InLight's expected market valuation had fallen by 75%. *Id.* ¶18.

On June 20, 2000, InLight gave Comdisco a revised proposal, asking Comdisco to loan InLight $3 million. Following this proposal, there were a series of discussions that resulted in Comdisco agreeing to loan InLight $2 million. On August 8, 2000, InLight's board of directors

authorized InLight "to borrow $2 million from Comdisco Inc. on the terms described in the Loan and Security Agreement and promissory note both dated August 1, 2000." *Id.* ¶22. The pertinent terms of the Loan Agreement were as follows:

> **Maturity** . . . principal and any accrued but unpaid interest under the Note shall be due and payable on demand by [Comdisco] on or after September 15, 2000.
>
> . . .
>
> **SECTION 8. EVENTS OF DEFAULT.**
>
> The occurrence of any one or more of the following events . . . shall constitute a breach and default under this Loan Agreement, the Note and the other Loan Documents, and shall constitute a breach and default under the Excluded Agreements [defined to include, among other agreements, the Sponsorship Agreement];
>
> 8.1   Borrower defaults in the payment of any principal [or] interest . . . .;
>
> . . .
>
> 8.4   Borrower . . . (ii.) Shall admit in writing its inability to pay its debts as they become due, or its inability to pay or perform under the Loan Documents or the Excluded Agreements; . . . shall cease operation of its business as its business has normally been conducted or terminates substantially all of its employees; or (vii) Borrower or its directors . . . shall take any action initiating any of the foregoing actions described in clauses (i) through (vi).

*Id.* ¶23.

On August 1, 2000, Comdisco issued InLight a check for $2 million. Comdisco initially doubted that InLight would repay the loan, and that intuition proved correct. By September 15, 2000, the date Comdisco demanded repayment of the loan, InLight was in dire financial straits. On September 22, 2000, InLight provided Comdisco with a "Status Report," which showed, among other things, that its liabilities exceeded its assets by several million dollars. On September 25, 2000, Comdisco sent a letter notifying InLight that Comdisco was exercising its

4

right to terminate the Sponsorship Agreement pursuant to Section 3.5 of that agreement and its right to terminate the Loan Agreement pursuant to Section 8 of that agreement.

After Comdisco filed for bankruptcy in July 2001, DSI, as assignee for the benefit of InLight's creditors, filed a proof of claim in which it sought to recover the $18.75 million remaining due under the Sponsorship Agreement as well as $40 million in lost value caused by Comdisco's breach. DSI claims that these damages were caused both by Comdisco's breach of contract and by violations of the Uniform Fraudulent Transfer Act (UFTA). *See* 740 ILCS 160/6. Comdisco objected to DSI's proof of claim and counterclaimed against DSI for breach of the Loan Agreement.

On July 20, 2005, the bankruptcy court granted Comdisco's motion for summary judgment on DSI's proof of claim and on its own counterclaim. The court said that the overwhelming number of DSI's 150 stated facts submitted pursuant to Local Rule 56.1 were immaterial to the dispute but noted that statement number eighty-eight raised an issue as to whether InLight invoiced Comdisco for the third quarterly payment. For that reason, the court denied Comdisco's motion as it concerned that payment.[1]

The bankruptcy court granted the remainder of Comdisco's summary judgment motion. It said that Comdisco had a legal right to terminate the Sponsorship Agreement no later than September 25, 2000, which was before the fourth quarter's payment came due. It also concluded that DSI's claim for $40 million was precluded because the agreement prohibited recovery of consequential damages and that the $18.75 million claim was precluded because the contract did

---

[1] The bankruptcy court later reduced the amount of Comdisco's recovery by the amount of the third quarterly payment plus interest and, after doing so, entered final judgment in Comdisco's favor.

not call for acceleration of payments upon breach. The court also held that DSI, as assignee for the benefit of creditors, did not have standing to assert a fraudulent transfer claim under the UFTA, and it rejected DSI's affirmative defense that the Loan Agreement was signed under economic duress. Finally, the court held that Comdisco was entitled to summary judgment in the amount of $2 million on its claim involving InLight's breach of the Loan Agreement.

The parties agree that Illinois law governs this dispute.

## Standard of Review

The Court reviews the bankruptcy judge's conclusions of law *de novo* but reviews his factual findings for clear error. *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995); *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1990). "The clearly erroneous standard . . . does not permit a trier of fact to be overturned 'simply because [the appellate court] is convinced it would have decided the case differently.'" *In re Bonnett*, 895 F.2d at 1157 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). Rather, if "two permissible conclusions can be drawn, the factfinder's choice cannot be clearly erroneous." *Id.* (citing *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir. 1988)).

## Discussion

DSI argues that the bankruptcy court's ruling was erroneous for a number of reasons. It claims that the court did not consider all 156 facts listed in its Local Rule 56.1 Statement; the Loan Agreement constituted a fraudulent transfer and lacked consideration; its economic duress, business compulsion, setoff, and recoupment defenses were all adequately raised and improperly rejected; and the Sponsorship Agreement allowed acceleration of payments upon breach.

Initially, the Court considers whether the bankruptcy court considered all of the facts

listed in DSI's Local Rule 56.1 Statement. In its ruling, the bankruptcy court rendered a comprehensive accounting of both parties' submitted facts in assessing which facts were both in dispute and material to the resolution of the summary judgment motion. The court started with DSI's facts and said, "The overwhelming portion of DSI's stated facts of 150 some paragraphs are simply not material to the disputes involved, and, consequently, do not prevent entry of summary judgment." July 20, 2005 Tr. at 2. The court then specifically analyzed Comdisco's thirty-four facts and concluded that thirteen were admitted, fourteen were effectively admitted, five were admitted through denials not supported by the record or were simply irrelevant, and two created issues of fact that were unnecessary to resolve given the court's ruling on another matter. *Id.* at 2-3. Finally, the court said that the only factual statement that rendered summary judgment inappropriate on any legal issue was DSI's factual statement number eighty-eight, which raised issues about whether InLight sent Comdisco an invoice for the third payment under the Sponsorship Agreement. *Id.* at 3.

DSI essentially maintains that because the bankruptcy court held that nearly all of DSI's factual statements were immaterial to the dispute, the court somehow did not consider the importance of each statement. We conclude that – quite contrary to DSI's perception of Judge Black's ruling – the record reflects that the bankruptcy court took care to analyze each and every one of the factual statements submitted by the parties. The court accounted for every statement submitted by the parties and affirmatively set out factual statement number eighty-eight as one that created a genuine issue of material fact. The Court concludes that the bankruptcy court expressly considered each of DSI's facts; to the extent its resolution of those facts is claimed to have been erroneous, the Court will consider them in our discussion of the legal issues they

involve.

DSI next argues that the Loan Agreement was a fraudulent transfer under section 6(a) of UFTA. *See* 740 ILCS 160/6. At the outset, the Court notes that DSI's arguments are somewhat convoluted when it comes to describing this claim. At some points, DSI maintains that by signing the Loan Agreement, Comdisco made a fraudulent transfer, *see* Reply Brief at 7, and at others it maintains that Comdisco received a fraudulent transfer. *See* Opening Brief at 12. It makes little sense for DSI to argue that Comdisco made a fraudulent transfer, given DSI's insistence that Comdisco received the benefit of the Loan Agreement's cross-default provision (i.e., the clause that terminated Comdisco's obligations under the Sponsorship Agreement in the event DSI defaulted on the Loan Agreement). The whole point of the UFTA is to allow creditors to undo transactions in which a transferor gave away money or assets without receiving reasonably equivalent value in return. *See In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998).

The Court therefore treats DSI's fraudulent transfer claim as one that attempts to undo a transfer from the debtor, DSI, to Comdisco. To establish a claim under section 6(a) of the UFTA, a creditor must prove that the debtor made a transfer, the creditor's claim arose before the transfer, the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transferred property, and the debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer. *See Falcon v. Thomas*, 258 Ill. App. 3d 900, 909, 629 N.E.2d 789, 795 (1994). Proof of actual fraudulent intent is unnecessary. *Id.*

The bankruptcy court ruled that DSI lacked standing to raise a fraudulent transfer claim on behalf of InLight because, as a party to a fraudulent transfer, InLight could not raise the claim

itself. *See Getty v. Hunter*, 166 Ill. App. 3d 453, 457, 519 N.E.2d 1040, 1042 (1988). The bankruptcy court held that DSI, as an assignee for the benefit of creditors, accepted InLight's assets subject to all defects in title to which those assets were subject in the hands of the assignor, and that as a result DSI, like InLight, had no standing to bring the fraudulent transfer claim.

The Illinois UFTA does not address whether an assignee for the benefit of creditors can bring a claim in this situation, but the parties' and the Court's research has uncovered three pre-UFTA Illinois cases that addressed this issue. The problem is that the most recent case was decided more than one-hundred years ago. *See Hinkley v. Reed*, 182 Ill. 440, 443, 55 N.E. 337, 338 (1899); *Bouton v. Dement*, 123 Ill. 142, 149, 14 N.E. 62, 65 (1887); *Ross v. Sayler*, 104 Ill. App. 19 (1902). Another judge in this District had occasion to address the issue a few years ago, but she declined to do so, stating that the question appeared somewhat unsettled. *See Grabscheid v. E & A Indus., Inc.*, No. 01 C 8480, 2002 WL 31854967, *6 n.7 (N.D. Ill. Dec. 18, 2002) (Pallmeyer, J.).

We agree that the issue might be considered to be in doubt, given the amount of time that has passed since the Illinois Supreme Court last addressed it. The Court nevertheless concludes that, in the absence any statute indicating otherwise, the holdings of the aforementioned cases still represent good law in Illinois. The Court recognizes that Minnesota, Kentucky, and Wisconsin all appear to follow a different rule, allowing an assignee for the benefit of creditors to recover an assignor's fraudulent transfer, but that is only because their state legislatures passed statutes abrogating the common law. *See Field Furniture Co. v. Community Loan Co.*, 257 Ky. 825, 79 S.W.2d 211, 215 (1934); *Thomas Mfg. Co. v. Drew*, 69 Minn. 69, 74, 71 N.W. 921, 923 (1897); *S.L. Sheldon Co. v. Mayers*, 81 Wisc. 627, 51 N.W. 1082, 1084 (1892). The Illinois

legislature has passed no such law, and, in general, Illinois law provides that an assignee "receives only the rights the assignor possessed-nothing more." *See Evergreen Marine Corp. v. Division Sales, Inc.*, No. 01 C 4933, 2003 WL 1127759, *2 (N.D. Ill. March 12, 2003) (citing *Marvel of Ill., Inc. v. Marvel Contaminant Control Indus., Inc.*, 318 Ill. App. 3d 856, 865, 744 N.E.2d 312, 320 (2001)). As a result, the Court concludes that Illinois does not allow an assignee for the benefit of creditors to assert a fraudulent transfer claim involving a transaction to which the assignor was a party. The bankruptcy court was correct to grant summary judgment on this claim.[2]

In any event, the Loan Agreement was supported by adequate consideration. The transaction was not, as DSI contends, the unilateral transfer of all future profits to be received under the Sponsorship Agreement.[3] Rather, InLight received $2 million, and Comdisco received a promise to repay the debt and a further promise that if InLight defaulted on the loan, Comdisco's obligations under the Sponsorship Agreement would be terminated. It is hardly surprising that Comdisco demanded more than the simple promise to repay in exchange for its $2 million loan. When Comdisco made the loan, it knew that InLight faced financial uncertainty, and Comdisco needed to make sure that it had additional rights if InLight failed to repay the loan (which, in the end, is exactly what happened). Immediate cancellation of the Sponsorship Agreement – a contract that had become a great burden in Comdisco's eyes – in the event InLight

---

[2] DSI's citations to the Illinois UCC and the California UFTA, which both include an assignee for the benefit of creditors in their definition of "creditor," are unpersuasive.

[3] If it were, the transaction would be similar to the one held fraudulent in *Geyer v. Ingersoll Publications Co.*, 18 Del. J. Corp. L. 658, 676, 621 A.2d 784, 792 (1992), where the defendant corporation gave up fifty million dollars worth of contract revenue in return for benefits conferred on third parties.

defaulted, provided the extra incentive to make the loan.

At the same time, InLight rightly discounted the value of its future rights under the Sponsorship Agreement. Given InLight's undisputed financial uncertainty, it was entirely possible – indeed, altogether likely – that Comdisco would eventually be entitled to terminate the Sponsorship Agreement based on InLight's insolvency. By tying the Loan Agreement to the Sponsorship Agreement, InLight undertook a marginally increased risk that it would not collect all $18.5 million due under the Sponsorship Agreement. In exchange for this added risk and a promise to repay, InLight received $2 million dollars worth of financing.

DSI also maintains that the Loan Agreement was not supported by adequate consideration because though InLight obtained a $2 million dollar loan, Comdisco already owed InLight $1.85 million, meaning InLight actually netted only $150,000. This argument misconstrues the effect of the $2 million dollar loan. InLight did not cancel Comdisco's $1.85 million dollar contractual obligation by accepting the loan. Rather, InLight received the $2 million dollar loan and maintained its right to collect the $1.85 million.

DSI next argues that it offered evidence from which a fact finder reasonably could find that Comdisco induced InLight to sign the Loan Agreement under circumstances amounting to economic duress. Specifically, DSI contends that Comdisco forced InLight to sign the contract by wrongfully withholding money due under the Sponsorship Agreement. To prove economic duress, DSI must show that InLight was induced by a wrongful act or threat to enter into a contract under circumstances that deprived it of its free will. *See RIV VIL, Inc. v. Tucker*, 979 F. Supp. 645, 655 (N.D. Ill. 1997); *Kaplan v. Keith*, 60 Ill. App. 3d 804, 807, 377 N.E.2d 279, 281 (1978). "[W]here consent to an agreement is secured merely through hard bargaining positions

or financial pressures, economic duress does not exist." *Krilich v. Am. Nat'l Bank & Trust Co. of Chic.*, 334 Ill. App. 3d 563, 572, 778 N.E.2d 1153, 1162 (2002). "Defendants cannot avoid [summary judgment] . . . merely by arguing the existence of economic duress is a factual issue to be resolved by the [finder of fact]." *FDIC v. Linn*, 671 F. Supp. 547, 556 (N.D. Ill. 1987).

In *Krilich*, the parties were two real estate developers. *Id.* at 565, 778 N.E.2d at 1157. The plaintiff contended that he signed a contract under economic duress because the defendant threatened to breach an already existing contract if the plaintiff did not sign. *Id.* at 573, 778 N.E.2d 1163. The court said that a threat to breach a contract ordinarily does not constitute duress and, recognizing that the plaintiff's attorney knew about the defendant's threat for three months prior to the contract being signed, held that the plaintiff's allegations did not rise to the level of duress. *Id.*

In *Kaplan*, the plaintiffs were home buyers who contracted to purchase defendants' home. *Id.* at 806, 377 N.E.2d at 280. Shortly before the closing, the plaintiffs realized that the defendants had removed certain purchased items from the home and had damaged portions of the house. *Id.* When the plaintiffs brought these issues to the defendants' attention, the defendants allegedly refused to close the sale unless they were given a release. *Id.* The plaintiffs executed the release because they had to give up possession of their own house on or near the date set for closing and had no other place to move. *Id.* The court held that the defendants' threat to breach the contract constituted economic duress and said, "Ordinarily, a threat to break a contract does not constitute duress, and to infer duress, there must be some probable consequences of the threat for which the remedy for the breach afforded by the courts is inadequate." *Id.* at 807, 377 N.E.2d at 281. The Court further noted that if the plaintiffs "resisted the defendants' demand for

release[,] they had no place to move with their family[] during the time needed to enforce their contractual claim through the judicial process." *Id.*

The facts in this case are much more analogous to *Krilich* than *Kaplan*. Unlike in *Kaplan*, DSI has offered no evidence that Comdisco's refusal to make payment under the Sponsorship Agreement would result in consequences that the judicial process could not remedy. Moreover, like in *Krilich*, InLight was aware of Comdisco's so-called threats in late June, more than a month before it signed the Loan Agreement, and the Agreement was approved by InLight's board of directors after substantial deliberation. Accordingly, the Court concludes that DSI has not offered evidence from which a fact finder reasonably could find that InLight signed the Loan Agreement under economic duress.

DSI next argues that the bankruptcy court erroneously ruled that its claim for $40,000,000 was barred because it sought consequential damages that were barred Section 8.2 of the Sponsorship Agreement and that the Agreement did not allow for acceleration of payments upon breach. "Consequential damages are special damages, those which will not always result from a breach of contract of the character of the particular breach, but which did flow from this breach and were foreseeable." 24 Williston on Contracts § 66:57 (4th ed. 2005). DSI has not offered evidence from which a fact finder reasonably could find that its $40,000,000 claim for the "unrealized value of InLight" is the type of damage that would foreseeably result from a breach of contract of this character. As for the bankruptcy court's ruling that the Sponsorship Agreement did not allow for the acceleration of payments upon breach, DSI has done little more than assert in conclusory fashion that the bankruptcy court was wrong. It has not cited any provision of the contract, or any other piece of evidence, that purports to allow such recovery.

13

For this reason, the Court concludes that summary judgment was proper on this issue.

Finally, the Court rejects DSI's setoff and recoupment defenses, because DSI has offered no legal basis for either defense other than the arguments, which the Court has already rejected, concerning fraudulent transfer and economic duress.

## Conclusion

For the reasons stated above, the Clerk is directed to enter judgment affirming the decision of the bankruptcy court.

                                                                  MATTHEW F. KENNELLY
                                                                   United States District Judge

Date: April 10, 2006